IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARY A. FRANK,

        Plaintiff,

vs.                                                                    No. CIV 09-714 MCA/LFG

MICHAEL J. ASTRUE,
Commissioner,
Social Security Administration,

        Defendant.

MAGISTRATE JUDGE'S ANALYSIS
AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on Plaintiff Mary A. Frank's ("Frank") Motion to

Reverse or Remand Administrative Agency Decision, filed February 10, 2010.  [Doc. Nos. 15, 16.]

The Commissioner of Social Security issued a final decision denying benefits, finding that Frank

was not disabled and not entitled to disability insurance benefits ("DIB").  The Commissioner filed

a response to Frank's Motion [Doc. 17], and Frank filed a reply [Doc. 20].[2]  Having considered the

pleadings submitted by the parties, the administrative record and the applicable law, the Court

---

[1] Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that
party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party
must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party
wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review
will be allowed.

[2] Frank's reply was late after having requested and received several extensions to the briefing schedule.  On
June 3, 2010, the Court issued an Order to Show Cause, requiring Frank's attorney to explain why the late reply
should be considered. [Doc. 22.] On June 11, 2010, Frank filed a response, explaining the failure to file a timely
reply was the result of a calendaring error. [Doc. 23.] The Court determined that Plaintiff provided sufficient
explanation for the late filing and therefore, considered the reply in reaching its proposed recommendation.

recommends that the motion to reverse or remand be denied and that this matter be dismissed, with prejudice.

## I.   **PROCEDURAL RECORD**

On July 21, 2006, Frank applied for DIB [AR 95], alleging she was disabled since December 3, 2005, due to mental and physical conditions, including post traumatic stress disorder (PTSD), depression, anxiety, abnormalities in her lower spine, and a thyroid condition.  [AR 39, 65, 95.] Frank's DIB application was denied at the initial and reconsideration levels. [AR 21, 58, 59, 60, 65.] On August 21, 2008, the ALJ conducted an administrative hearing in Albuquerque, New Mexico, at which Frank chose to appear and testify without the assistance of an attorney or other representative. [AR 21, 35-37.] On December 2, 2008, the ALJ issued a decision denying Frank's DIB application. [AR 18-29.] Frank filed a request for review, and submitted additional evidence, which the Appeals Council considered before denying her request on June 18, 2009. [AR 1, 2, 6, 10, 14.] On July 22, 2009, Frank filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Frank was born on April 9, 1965, and was 43 years old at the time of the ALJ hearing.  [AR 39, 95.]  Frank graduated from high school and took some college classes about 20 years ago. [AR 42, 121, 256.] For about one year, until December 2005, Frank worked as a coordinator/secretary for the Albuquerque Public Schools ("APS") with a special education program called "Child Fun project." [AR 43.] Previously, Frank worked as a secretary or data entry clerk in temporary positions.  Frank described her position with APS as involving "running the whole floor," helping people with their "IT problems," running her office, keeping records, obtaining records, and forwarding records to requesting institutions. [AR 43-44.] Frank stated that she "walked out" of that job because she was told she was "an idiot." [AR 44.]   Frank did not attempt to apply for any other work after that date.

Frank lives at home with her husband, who retired from the Army, and has organic brain dysfunction. He is classified as 100% disabled. [AR 48, 135.] Frank's earning records indicate she made from $5857.00 in 1995 to $13,844 in 2005. Her highest earnings between 1994 and 2005 ($11,240 to $17,328) were in the years 1994, 1998-2001, and 2003-2005. [AR 101.] During other years, Frank's earnings ranged from $5800 to $9600. [AR 100-101.]

## II.   STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[9] age, education and past work experience, she is capable of performing other work.[10]

Here, the ALJ determined at step four of the sequential evaluation that Frank was capable of performing her past relevant work as a secretary and data entry worker. [AR 29.]

## III.   <u>STANDARD OF REVIEW</u>

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  <u>Langley v. Barnhart</u>, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  <u>Doyal v. Barnhart</u>, 331 F.3d 758, 760 (10th Cir. 2003); <u>Langley</u>, 373 F.3d at 1118; <u>Hamlin v. Barnhart</u>, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  <u>Hamilton v. Sec'y of HHS</u>, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  <u>Langley</u>, 373 F.3d at 1118; <u>Hamlin</u>, 365 F.3d at 1214; <u>Hargis v. Sullivan</u>, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  <u>Hamlin</u>, 365 F.3d at 1114.

---

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of all the evidence" [AR 21], the ALJ denied Frank's request for DIB. [AR 21-29.]  The ALJ determined Frank had not been engaged in substantial gainful activity since December 3, 2005, the alleged onset date, and further, that she had severe impairments of lumbar degenerative disc disease (DDD), Hashimoto's thyroiditis,[11] and gastroesophageal reflux disease (GERD). [AR 23.]  The ALJ found that Frank's headaches or migraines were non-medically determinable impairments, and that her irritable bowel syndrome (IBS), post traumatic stress disorder (PTSD), depression, and panic disorder were nonsevere impairments. [AR 23-24.]  The ALJ further determined that none of Frank's impairments or combination of impairments met listing criteria.  [AR 26.]  "After careful consideration of the entire record," the ALJ concluded that Frank

_____

[11]"In Hashimoto's disease, also known as chronic lymphocytic thyroiditis, your immune system attacks your thyroid gland. The resulting inflammation often leads to an underactive thyroid gland (hypothyroidism). Hashimoto's disease is the most common cause of hypothyroidism in the United States." http://www.mayoclinic.com/health/hashimotos-disease

had the residual functional capacity ("RFC") to perform light work and specifically that she was able to lift up to 20 pounds occasionally and 10 pounds frequently.  She could stand, sit or walk for a total of about six hours, with regular breaks.  She had occasional limits in her ability to climb ramps, stairs, ladders, ropes and scaffolds, and occasional limits in her ability to balance, stoop, kneel, crouch and crawl.  She was to avoid concentrated exposure to extreme cold and hazards. [AR 26.] The ALJ also found that Frank's subjective complaints and alleged limitations were not fully persuasive and that she retained the capacity to perform work activities in accordance with the identified limitations. [AR 29.]

The ALJ decided that Frank's RFC did not prevent her from performing her past relevant work as a secretary and data entry worker.  In so finding, the ALJ relied in part of the vocational expert's testimony that was consistent with information contained in the Dictionary of Occupational Titles. [AR 29.]

## IV.    MEDICAL HISTORY AND BACKGROUND

### 2004 Medical Records

On February 9, 2004, Frank was seen by Donna Tully, a physician's assistant. [AR 269-270.] She had suffered from right shoulder and thoracic pain, off and on, for about a week. [AR 269.] She wore bilateral forearm splints and had recurrent occasional right shoulder pain.  She had no recent history of a fall or trauma.  Frank took four or five Ibuprofen for pain.  She denied right upper extremity numbness or weakness.  There was no decrease of range of motion in her shoulder.  Her medications were listed as: Ibuprofen, Nexium (for GERD), Zyrtec (for allergies), Nasarel spray,

6

Celexa,[12] and Maxalt.[13]  In examining her right arm, there was full active range of motion without pain, stiffness or limitation.  There were, however, acute bilateral rhomboid muscle spasms.  Frank was to avoid heavy lifting or twisting and to return for a follow-up appointment in the next ten days.  There is no indication in the record that Frank made a follow-up appointment.

At Frank's October 6, 2004 eye appointment, she asked for eyeglasses.  She complained of headaches for eight months. [AR 174, 263] The record indicates she was taking Nortriptyline,[14] Synthroid (thyroid replacement), Nexium, Celexa, and Dicyclomine.[15]

### *2005 Medical Records*

On June 8, 2005, Frank was seen by Dr. Krueger-Uhing, when the risks of smoking were discussed.  Frank was seen in the ER two weeks ago for either gallbladder or heart problems, but there is no corresponding medical record that is part of this record.  She was evaluated for various conditions, including thyroid problems. [AR 233.]

On July 22, 2005, Frank was seen for an eye exam, but the record is difficult to read. [AR 230.]

---

[12]Celexa or "Citalopram is an antidepressant (selective serotonin reuptake inhibitor-SSRI) used to treat depression. It works by restoring the balance of certain natural substances (neurotransmitters such as serotonin) in the brain."  It may also used to treat other mental conditions (obsessive-compulsive disorder, panic disorder). www.webmd.com

[13]Maxalt or "Rizatriptan is used to treat migraines. It helps to relieve headaches, pain and other symptoms of migraines, including sensitivity to light/sound, nausea, and vomiting. Prompt treatment allows you to get back to your normal routine and may decrease your need for other pain medications. Rizatriptan does not prevent future migraines or reduce how often you may get a headache."  www.webmd.com

[14]"This medication is used to treat mental/mood problems such as depression. It may help improve mood and feelings of well-being, relieve anxiety and tension, and increase your energy level. This medication belongs to a class of medications called tricyclic antidepressants."  www.webmd.com

[15]Bentyl or Dicyclomine is an antispasmodic and anticholinergic (antimuscarinic) agent used to treat IBS. http://www.rxlist.com/bentyl-drug.htm

Frank set forth December 3, 2005 as the onset date of her alleged disabilities.  This is the last date she worked for APS.

On December 13, 2005, Frank was seen by Laura Bellew,[16] a nurse practitioner with the Veteran's Administration (VA) health care center to discuss medical problems.  Frank had GERD and also increased aches and pains "everywhere in her body."  She had a history of a motor vehicle accident (MVA) and disc problems in her back.  Frank also had a history of hypothyroidism and wanted a "sono" because of thyroid enlargement.  She complained of frequent, severe migraines.  Her neurological evaluation in the past was normal.  Her depression was well controlled with Celexa.  NP Bellew prescribed Topamax for the migraines and increased the Nortriptyline.  Lab work was ordered to assess Frank's thyroid condition. [AR 229.]

### *2006 Medical Records*

On January 27, 2006, NP Bellew saw Frank for multiple problems.  Her labs were abnormal with an elevated "ANA."  Frank complained of increased muscle and joint pain, but did not take pain medication or denied the need for it.  Frank had daily headaches that she lived with and insomnia.  She denied significant depression. [AR 227.]

On February 27, 2006, Frank's list of medications included Celexa, Rizatriptan (Maxalt), Flexeril,[17] Bentyl, Aspirin, Norethindrone (contraceptive), Nortriptyline, Topamax, Synthroid, Zyrtec, Ambien (used for insomnia). [AR 223.]  The clinic notes indicate she was being seen for insomnia, chronic pain, and hypothyroidism. [AR 224.] She denied depression.  It appears Frank

---

[16]Frank was seen at the VA, where her primary medical care provider was Laura Bellew, a nurse practitioner (NP).  NP Bellew is often referred to as "Dr. Bellew" in the administrative record.

[17]Flexeril relaxes muscles. It is used along with rest and physical therapy to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries.  www.webmd.com

wanted a referral to a psychiatrist regarding her sleep problems.  She complained of chronic pain in her back, and neck pain radiculopathy.[18]  Her range of motion was limited due to pain.

In February 2006, Frank had an eye exam and follow up for Hashimoto's disease.  She had some bulging and aching in the eyes and complained of "floaters" and migraines. [AR 225.]

On April 24, 2006, Frank was evaluated by Dr. Charles F. Pace, a pain specialist.  She presented with complaints of lumbosacral spine pain. [AR 188, 287.] She was referred by "Lt. Bellew" for evaluation and treatment of back, arm, and leg pain.  The worst pain was in the lumbar spine with some referred pain.  She described having the pain for 10 years.  She rated the pain at its worst as 10 of 10, and at its best, as 5 of 10.  The pain was "aching and stabbing" and present during most of the day.  The pain, according to Frank, worsened with prolonged sitting, standing, or walking.  After walking for 10 minutes, she limped.  Muscle relaxers and rest somewhat relieved the pain.  She had associated symptoms of numbness, weakness, and interruption of sleep.  Frank had a medical history of Hashimoto's thyroiditis. [AR 188.]

At this time, Frank took Rizatriptan benzoate, Dicyclomine (for IBS), Cetirizine,[19] Aspirin, Zolpidem (Ambien), Nexium, Nortriptyline, Folic Acid, Topiramate (Topamax), Citalopram, Levothyroxine (thyroid replacement), and Norethindrone (contraceptive).  Frank admitted tobacco and alcohol use, describing her drinking as moderate.  Her mental and physical examinations this day were fairly normal. [AR 189.] She had excellent range of motion in the trunk area.  Flexion caused mild pain, and extension caused moderate pain.  There was, however, severe tenderness with

---

[18]"Radiculopathy is not a specific condition, but rather a description of a problem in which one or more nerves are affected and do not work properly (a neuropathy). The emphasis is on the nerve root (Radix = "root"). This can result in pain (radicular pain), weakness, numbness, or difficulty controlling specific muscles." http://en.wikipedia.org/wiki/Radiculopathy

[19]This medication is an antihistamine that treats symptoms such as itching, runny nose, watery eyes, and sneezing from "hay fever" and other allergies. It is also used to relieve itching from hives.  www.webmd.com

palpation over areas of the back.  The summary of a lumbar spine MRI, dated March 23, 2006, noted a focal left paracentral annular disc tear but no canal stenosis and no foraminal narrowing.[20]  At L5-S1 there was severe degenerative loss of disc height and signal.  There was mild diffuse disc bulging and some degenerative facet arthrosis.  There was moderate bilateral neural foraminal narrowing, with mild nerve root compression of the exiting L5 nerve roots.  Dr. Pace's diagnosis was lumbosacral spondylosis[21] without myelopathy and pain in the joint involving Frank's pelvic region and thigh. [AR 189.] Conservative treatment was recommended. [AR 189.]

On May 1, 2006, Frank was seen at UNM Mental Health Center and referred to psychotherapy with Rebecca Frock.  The record indicates Frank was unemployed since December 2005.  She had not received therapy or counseling before this time.  The record states Frank "walked off the job 12/05 due to increasing anger, frustration; depressed." [AR 177.]

The psychiatric assessment on May 1, 2006 notes that Frank felt like she was "losing her grasp on things."  She felt "jumpy or nervous."  "I don't care anymore."  She recounted a "disjointed history" of "increased anger and irritation at work leading to her walking out of her job," "controlled symptoms since."  Frank had a history of depression and anxiety and was currently treated with Celexa since 2000, Nortriptyline for sleep, and Ambien for sleep.  She had a long history of insomnia.  She had decreased energy, concentration and motivation.  She had suicidal thoughts including thoughts of overdosing on pills, but she was not currently suicidal.

---

[20]There are no corresponding medical records or reports regarding any MRI mentioned in the doctor's reports.

[21]"Lumbosacral spondylosis is a painful degenerative spinal condition that occurs primarily as the result of aging. Spondylosis can affect several areas of the spine, but when it occurs in the lower, or lumbar, part of the spine, it is called lumbosacral spondylosis. While surgery may be needed in more severe cases, most people can find relief of symptoms through non-surgical means."  http://www.ehow.com/about_5079593_lumbosacral-spondylosis.html

Frank had a history of physical and emotional abuse by her mother and maternal grandmother.  Her mother ran over her foot deliberately.  She was beaten with a belt and tied up.  She exhibited symptoms of PTSD.  Frank could not trust women and had no sense of a future.  She felt numb.  She saw people out of the corner of her eye and heard voices at times.  She had an occasional "up" day when she felt energetic and "super good."  Frank got "ill" thinking of looking for a job. [AR 178-79.]

It appears Frank drank a "6-pack" of beer over a few hours the day before.  She drank "QOD" (every other day), "6 pack at most." [AR 178.]  The assessment also notes that Frank's husband has "organic brain dysfunction" since a "MVA on base in 1980's."  The interviewing health care provider assessed Frank as "moderately ill.  She was diagnosed with "MDD [major depressive disorder] moderate to severe," had PTSD symptoms, had lumbar and cervical arthritis, Hashimoto's thyroid condition and migraines. [AR 180.] This doctor added Effexor[22] and Trazodone[23] and discontinued Ambien.  Celexa, which was not effective, was decreased.  The doctor encouraged Frank to decrease alcohol use. [AR 180.]

On May 2, 2006, Frank saw Dr. Pace for bilateral lumbar facet joint injections. [AR 187, 286.]  On May 22, 2006, Dr. Pace thought Frank might be a candidate for lumbosacral medial branch rhizotomy in the future. [AR 185, 285.] On this date, Frank received bilateral lumbar facet joint injections.

On June 13, 2006, Dr. Pace described Frank as pleasant and mildly obese and in no apparent distress.  The exam revealed severe pain with palpation over the bilateral L5-S1 lumbar facet joints,

---

[22]Effexor or Venlafaxine is an antidepressant (serotonin-norepinephrine reuptake inhibitor type-SNRI) used in the treatment of depression and anxiety.  www.webmd.com

[23]This medication is used to treat depression.  www.webmd.com

from right to left, and over the SI joints bilaterally.  There was pain in the joint involving the pelvic region and thigh.  That day, she received a "RF [radio-frequency] ablation of the right LL2-S1 medial branch nerves." [AR 183, 284.]

There is a June 28, 2006 record stating that the psychiatrist wanted Frank to see a counselor. [AR 236.]

On July 21, 2006, Frank filed her DIB application alleging she was disabled as of December 3, 2005. [AR 95.] In her disability report, Frank stated she was 5'7" and weighed 175 pounds. [AR 114.] The conditions that prevented her from working were listed as: "ibs; ptsd; arthritis; hashimoto's disease; depression; anxiety; insomnia; migraines; acid reflux." [AR 115.] Frank further stated she had trouble concentrating, had panic attacks "just thinking about going out to work," had chronic arthritis pain all day and night, and could not "do the job" because of "nerve damage." [AR 115.] On this form, Frank stated she stopped working on December 3, 2005 because the pain had become "great" and she could not get around well.[24] [AR 115.]

Frank had been a manager in retail from 1990-1992, and from 1992 to December 2005, she had performed secretarial and data entry work.  In her data entry work, Frank answered telephones, set up appointments, filed, made photocopies, researched and performed trouble shooting. [AR 116.] She supervised several people in her position. [AR 117.]

During the face-to-face interview with disability services on July 21, 2006, the interviewer did not notice Frank having any difficulties, but stated while she handled the interview well, she seemed to be in a lot of pain, demonstrated by walking carefully from the lobby to the desk. [AR 124.]

---

[24]This explanation of the reason Frank left her last job conflicts with other records that state she simply walked off the job due to issues with a supervisor or depression.  *See, e.g.,* AR 44, 177, 279-80.

On July 24, 2006, Frank saw therapist, Charlene McIver, Ph.D.  Frank complained of hearing voices and seeing things out of the corner of her eye.  Her grandmother beat her and said Frank "was a wild horse that needed to be tamed."  McIver diagnosed her with panic, hallucinations, and assigned her a GAF of 50. [AR 279.] Frank told McIver that she hit a wall in December and just walked out of her job.  She was a secretary to an APS coordinator and was doing well.  She was a "temp" worker from 2002 to 2005.  It appears Frank she started having job problems in August 2005 when she was placed on probation.  "She could not take it."  She was unable to stabilize the Hashimotos disease.  When she applied for jobs, she suffered panic attacks. [AR 280. ]

On July 28, 2006, Frank had an eye examination.  The record is mostly illegible, but it states Frank had "thick, clear discharge" from her eyes.  The doctor recommended smoking cessation. [AR 220.]

On July 31, 2006, Frank saw McIver.  Frank's husband was being very difficult and there were suicidal threats.  She needed new teeth.  It is not clear why.  [AR 278.]

On August 8, 2006, Frank filled out an adult function report.  Her daily activities included reading, watching television, washing dishes, doing laundry and cooking, and taking either her husband or herself to doctor's appointments. [AR 127.] She cared for her husband, drove him to appointments, cooked, and made sure he took his medications.  Frank cared for pets and sometimes took walks. [AR 128.] She used to enjoy life and shower, work, walk and play.  She no longer could sleep or she slept too much. [AR 128.] Frank could barely change her clothes and bathed once a week.  She fed herself only when she was hungry; she had no desire to cook or eat.  She could not drive for long periods of time and was prone to panic attacks. [AR 128-29.] She did not perform yard work as she could not maintain a hand grip and had no ambition.  Frank could go grocery shopping but not often or for long.  She was not able to pay bills or handle bank accounts. [AR 130.]

Frank rarely went out and mainly spent time at home in her room or with her husband. [AR 131.] She had no social activities since December 2005. [AR 132.]

With respect to limitations, Frank checked every box on the form, including lifting, squatting, talking, hearing, seeing, memory, concentration, using hands, following instructions, and understanding.  [AR 132.] She stated she used to be able to lift 30 pounds but could not do so now. She could walk at least five miles a day but now only a quarter of a mile.  She could not sit or stand for long.  Frank could not retain information for long and could not follow spoken instructions well. [AR 132.] If stressed, Frank "broke down and cried."

Frank was using a cane, brace or splint for both wrists and wore glasses. [AR 134.] She had worn prescription braces for seven years, but there is no corresponding medical record indicating braces were prescribed.

In the "remarks" section of this report, Frank wrote that since December 2005, she had completely lost interest in bathing, cleaning her room, washing her clothes, watching the news, working on the computer, or going out. [AR 135.] She also complained about her back and arthritis and stated her teeth were falling out.  She was taking "fourteen different medications for maintenance and pain" and yet none of the medical records confirm she was taking prescription pain medications.  Frank could not sleep.  She spent most of her time at home caring for her husband. [AR 135.]

On August 5, 2006, Frank's husband filled out a third-party adult function report. [AR 139.] He stated he spent most days and nights with Frank, that she had a bad sleeping problem, she took her medications, and helped him out. [AR 139.] She watched her husband daily and kept him from getting hurt while doing yardwork. [AR 140.] Frank reminded her husband to walk or feed the animals.  Before her disability, she was a secretary.  She now had panic attacks.  Her husband did

14

not find that Frank had problems with personal care. [AR 140.] Frank rarely ate or cooked and had "no drive." She was able to do the laundry and light cleaning. Frank needed reminders to do chores. [AR 141.] Because Frank did not clean the house much, her husband asked friends for help. Frank had panic attacks if she went out in public. She was unable to manage finances. [AR 142.] While her husband could go out alone, Frank tended to stay home and was more withdrawn.

According to her husband, Frank was quick to anger and could not communicate well. She feared the police and was very confrontational with them. [AR 144-45.] Frank's husband checked nearly every box on the form indicating Frank had many physical or mental limitations.

In the "remarks" portion of this report, Frank's husband stated that his wife was his caregiver. He was rated 100% disabled by the VA. The loss of Frank's income had been difficult although Frank's husband had a VA pension. [AR 146.]

On August 21, 2006, Frank saw Dr. Pace for complaints of lumbosacral spine pain. Frank noted improved pain in the right lumbar spine as a result of a procedure in June 2006. She was there to undergo rhizotomy procedures of the left L2-S1 medial branch nerves. [AR 283, 400.]

On August 30, 2006, Frank saw McIver. She had a lesion related to her sciatic nerve. She needed dentures and had obtained a home equity loan. She was still waiting on her disability application. Her house was "trashed," and said her husband "just goes off."

On September 15, 2006, Dr. David Green performed a Physical RFC Assessment. Frank's primary diagnosis was lumbar DJD (degenerative joint disease), and the secondary diagnosis was Hashimoto's thyroiditis. She also had GERD and migraines. [AR 193.] Dr. Green limited Frank to 20 pounds of occasional lifting and 10 pounds of frequent lifting. She was able to stand, walk, sit for six hours of an eight-hour work day. Her ability to push and pull was unlimited. Dr. Green summarized Dr. Pace's notes and treatment and concluded that by one year, Frank would have

completed a course of treatment for her back pain and would be capable of light level work. The assessment related to her migraines was that she did not receive frequent acute care visits for them. [AR 195.] She was assessed with occasional postural limitations, including climbing, balancing, stooping, kneeling, crouching and crawling. There no manipulative, visual, or communication limitations. Frank was to avoid concentrated exposure to extreme cold, noise and hazards. [AR 197.]

On September 21, 2006, Frank needed new glasses. She had dry eyes from Hashimoto's disease. [AR 266.]

On September 26, 2006, Dr. J. LeRoy Gabaldon performed a Psychiatric Review Technique assessment. He found that Frank's mental impairments were not severe. [AR 202.] He determined that Frank had major depression but that it did not meet diagnostic criteria. [AR 205.] He assessed her with mild limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence or pace. [AR 212.] Dr. Gabaldon noted that Frank stopped work in December 2005 but did not seek treatment until May 2006. Her response to treatment appeared to be positive and rapid. There was no indication of thought disorder or severe cognitive limitation. She was not currently suicidal but did attempt suicide when she was a teenager. She was taking medications that appeared to be effective. She was diagnosed with major depression, "partial remission." [AR 214.]

On September 27, 2006, Frank's claim for DIB was denied.

On October 24, 2006, Frank filed a request for reconsideration, stating that she had recently started seeing a psychiatrist and was taking new medications. However, her health had not improved and she was afraid to go out in public. [AR 64.]

16

On October 25, 2006, Frank was seen for vertigo, nausea, and diarrhea. It appears she was taken by ambulance to the VA Hospital. [AR 386.]

On October 30, 2006, Frank saw McIver. The first line of McIver's notes state: "it sucks." Frank had vertigo and went to the ER by ambulance. She was given Antivert for motion sickness and Phenergen for nausea. She had had four similar attacks in the last three years, but they are not documented in the medical record. She was about to have her teeth extracted. Her hair was coming out in clumps, but her thyroid was "ok." It was difficult to walk because of sciatic nerve pain. [AR 276.]

On November 20, 2006, Frank had an eye examination. She was seeing 20/20 with her old glasses. [AR 323.] Frank was doing well. It seems that Frank may have had most of her teeth removed in November 2006, but there is no corresponding dental record or explanation for the extractions.

On December 7, 2006, Frank saw therapist McIver, whose notes indicate that Frank had her teeth removed. She was unable to leave the house because of intense anxiety and fear of going out or seeing others. She had been to the ER two times in the past three weeks, but there are no corresponding ER records in November unless they were illegible. The psychologist's notes say: "fleas? vertigo – vomiting - extreme pressure on chest." The Hashimoto's affected her eyes. Frank's doctor said she was stable then. She was having "weird vivid dreams" and had heard her name called. [AR 274.]

Frank discussed her husband being disabled since 1987 because of a car accident. He now was going blind. [AR 275.] Frank and her husband sometimes fought for three days at a time. Every "once in a while, Frank felt suicidal as "it'll get to me." She avoided social settings.

17

Frank stated she would sleep more than she was awake, but had insomnia since she was 13 years old.  She felt anxious almost every day, but it was a low level generalized anxiety.  When she had panic attacks, she felt nauseated and light-headed.  She could not breath and felt tightness in her throat and chest.  Her hygiene was noted as poor. [AR 275.]

### *2007 Medical Records*

A January 19, 2007 medical record indicates Frank was a non-compliant patient.  She suffered from depression/anxiety but was "doing well" on Effexor, Celexa, and Ambien.  She was also sleeping well. [AR 319.] The migraines were controlled with Topamax.  She was seeing Dr. Pace for chronic neck and back pain.  She complained of being in pain all the time and wanted another referral to continue treatment.  Frank stated she felt "jittery."  The GERD was well controlled by Nexium.  Her dress and hygiene were reasonable on this date.  She was taking Vicodin[25] but this is the first medical record located showing Frank was taking a narcotic pain killer. [AR 319.]

On February 3, 2007, a disability consultative physician, Dr. Greg McCarthy, examined Frank. [AR 242.] Her alleged diagnoses were: IBS, PTSD, Arthritis, Hashimoto's disease, Depression and Anxiety, Migraines, and GERD.  Frank had a history of IBS controlled by diet.  She had low back/lumbar and cervical arthritis.  She stated she fell on concrete on her tail bone 8 years ago and had a series of accidents over her life.  She was in a MVA 15 years ago.  She recalled a "slip and fall" at ages 8 and 10.  She reportedly was run over by a car when she was 12.  She was treated for chronic pain and "is opiate dependent."  She noted she had an RF ablation of the right L2 through S1 medial branch nerves that did not help. [AR 242.]

---

[25]This combination medication is used to relieve moderate to severe pain. It contains a narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen).  www.webmd.com

Dr. McCarthy noted the MRI report from April 24, 2006 that referenced a focal left paracentral annular disc tear. There was severe degenerative loss of disc height and signal at L5-S1. Frank had tingling in her hands. Frank said she had bulging of her left eye from Hashimoto's disease. She was on thyroid replacement medication and had a longstanding history of depression and anxiety. She slept 4-5 hours a night, easily angered and was very jumpy. She was waiting for a psychiatric consultation. She also had a long history of vascular migraines and GERD. [AR 243.

Frank was seen at the ER for vertigo 6 months earlier but denied hypertension, diabetes, myocardial infarction or CVA. She smoked a pack of cigarettes every day since age 15 and drank 14 beers or more a week, on average. [AR 243.

Frank was able to feed and dress herself. She reported she could stand 10 minutes maximum at one time. She could walk one block on level ground and could sit for 15 minutes. She was able to lift 10 pounds occasionally. She could drive a car and could do household chores for limited periods. She had difficulty with stairs. [AR 243.]

At this time, Frank was taking: Hydrocodone (form of Vicodin), Nortriptyline, Promethazine, Meclizine for dizziness, Celexa, Effexor, Ambien, Aspirin, Topiramate, Nexium, L-thyroxine, birth control medication, and Zyrtec. [AR 243.]

Frank had no visual problems. Dr. McCarthy described her as a well-developed, well-nourished obese female in no acute distress. She weighed 177 pounds. She transferred to the exam table with slight difficulty. Her range of motion in the shoulders and cervical spine was normal. Her lumbar range of motion was normal, as was her range of motion in her hips, ankles and knees. She laid straight back on the table and resumed a seated position with slight difficulty. Frank could walk on her heels and toes. Her neurologic motor strength was 5/5 in all proximal muscle groups. [AR 244.]

Dr. McCarthy's impression was that she had multiple medical issues, including IBS, DDD of the cervical and lumbar vertebra, Hashimoto's disease with eye involvement, depression, anxiety, and insomnia. [AR 245.] Frank gave her best effort and was cooperative during the exam. Dr. McCarthy concluded Frank would have difficulties negotiating long and short distances on uneven terrain, difficulties sitting, standing, and walking for extensive periods of time over 20 minutes without a break. Dr. McCarthy assessed Frank with mild restrictions in bending, stooping, or crouching. She could carry 10 pounds occasionally. There were no restrictions in her ability to handle, reach or grasp unless she was standing or stooping or squatting at the same time. She had no visual or communicative limitations. [AR 245.]

On February 15, 2007, Dr. Janice Kando performed another Physical RFC Assessment. [AR 247.] She found the same exertional limitations as were determined before – occasional lifting of 20 pounds; frequent lifting of 10 pounds; 6 hours of sitting, standing or walking; and unlimited ability to push or pull. [AR 248.] She had occasional postural limitations in all categories, similar to the first RFC. [AR 249.] Dr. Kando noted that while Dr. McCarthy found Frank would have difficulties walking, sitting, or standing for more than 20 minutes without breaks, the medical exam reasonably supported Frank's ability to sit for 2 hours at a time and stand or walk up to 6 hours utilizing regular breaks. [AR 253.]

On February 23, 2007, Dr. Louis Wynne performed another mental health consultative exam. [AR 255.] In assessing Frank's mental status, Dr. Wynne noted that she drove herself unaccompanied to his office. She weighed 178 pounds and apparently had lost weight in the last six months, possibly due to the loss of her teeth. Recent fluctuations in weight were denied. She was dressed casually but neatly. Frank's hygiene was all right but Dr. Wynne noticed a strong odor of tobacco. Frank maintained good eye contact, related easily, and was cooperative. [AR 255.]

Frank spoke within normal limits.  She had suffered blackouts under the influence of alcohol but she appeared clear today.

When tested, Frank remembered and carried out a written 3-part set of directions.  She counted backwards by threes but not by sevens.  Her judgment was unimpaired. [AR 256.] She spelled a common five letter word backwards, and her short-term memory was unimpaired.  Her mathematical performance was uneven.  Her intelligence was average.

With respect to her history, Frank related that she was beaten both by her mother and grandmother and that on at least one occasion, she was tied up with a sister and thrown in a closet.  She graduated from high school in New Mexico in 1983 and spent one year at a business college.  [AR 256.] She took several falls on her tailbone at the ages of 7 or 8 and 9 or 10.  She was knocked unconscious at age 9.  At age 12, she was backed over by a sports utility vehicle, which impacted her knee.  She was thrown off a horse at age 15 and lost consciousness and suffered a concussion.  She hurt her right leg.  She sought no medical attention for these injuries.  At age 21, she was "t-boned" by a car and suffered whiplash.  Again, she did not seek medical attention.  At age 27, while standing still, she was rear ended at 45 mph, and her neck was "stretched 1.5 inches."  She was not wearing a seatbelt and her head hit the head rest several times.  She suffered soft tissue damage and was under the care of a chiropractor and physical therapist for about ten months.

At age 29, she was hit by a vehicle while riding a bicycle.  She injured her right foot. [AR 256.] When 33 years old, she was broadsided by a vehicle going 73 mph, and Frank's car became airborne.  She lost consciousness.

Frank reported that in November 2006, she had oral surgery to remove 23 teeth.  She was diagnosed with Hashimoto's disease, IBS, vertigo, migraines, GERD, arthritis, and tendonitis.  She was wearing glasses and wrist braces PRN.  The medications she was taking then were:

Hydrocodone, Meclizine, Effexor, Citalopram, Ambien, Nortriptyline, Cetirizine, Levothyroxine, Aspirin, Topamax, Bentyl, and Nexium. She denied any accidental or intentional overdoses or any episode of self-injury.

Frank first contacted a mental health professional at age 40, although she was depressed at age 25. Her first panic attack occurred at age 27. She described her current use of alcohol as occasional, but she drank excessively in her late 20s until her mid-30s. She smoked about a pack of cigarettes a day and used marijuana occasionally. [AR 257.]

Frank worked at fast food restaurants and in office work or temporary work. She had one DWI.

Dr. Wynne stated he had no reason to believe malingering or dissimulation on the part of Frank. He concluded she could read and understand basic written instructions and that her concentration and ability to persist at simple work tasks was mildly impaired. She could interact well with the general public but would have difficulty interacting with her coworkers and supervisors. Dr. Wynne diagnosed Frank with major depression, recurrent, moderate and panic disorder with agoraphobia. [AR 258.]

On February 6, 2007, Frank saw NP Bellew for a annual health visit. [AR 309.] Frank had smoked a pack a day for 25 years. She drank about 12 beers a week. She suffered moderate pain. Her psychological symptoms were stable. [AR 314.] Her depression and anxiety were noted as well controlled with current medications per psychiatry. [AR 315.] Vicodin is listed as a medication "PRN." In addition, in the personal history portion, it states "no mental or physical disability." [AR 314.]

On March 14, 2007, Frank's request for reconsideration of the denial of her DIB application was denied.

22

On April 10, 2007, Frank saw Dr. Pace for complaints of lumbosacral spine pain.  She was last seen on August 21, 2006 for left radio-frequency rhizotomies of the left L2-S1 medial branch nerves.  She obtained about 1-2 months of relief following earlier procedures in 2006.  She complained of pain in the lumbar region on this date, and pain in the upper back, bilateral arms and neck.  Her legs sometimes felt weak and she frequently felt numbness in the thumbs and forefingers. The MRI results did not explain the cause of her symptoms.  Dr. Pace discussed additional injections but that they were unlikely to provide a long term benefit.  They then discussed an evaluation by a neurologist or a rheumatologist and she was agreeable to that.  She weighed 178 pounds on this date. She was referred to Dr. Coquia for an evaluation and possible treatment; it is unclear if she ever saw Dr. Coquia. [AR 281.]

In May 2007, Frank filled out another disability report related to her appeal. [AR 159.] The form is lengthy and typewritten.  Frank alleged her condition had worsened since her last disability report, dated January 13, 2007.  Among her new complaints were the following: "thyroid still out of whack;" had lost 23 teeth; shook more often and was dropping things more often; more hair falling out; knees worse and could not move well; panic attacks in public; vertigo; "C-spine getting worse;" losing feeling in hands and arms, parts of back; pain in legs, knees, feet; more headaches; cannot sleep; taking many medications but quit Vicodin when it stopped working; afraid to go see psychiatrist; doctors cannot figure out her problems; forgets what time of day it is; after procedure for sciatica pain, pain returned. [AR 160.]

Frank described herself as depressed and anxious "all the time" and "very jumpy."  She might take a shower every two weeks.  She had no ambition or motivation.  She slept all day without going to the bathroom or eating.  She did not want to go out or speak to anyone.  She had no interest in anything.  Her hips "got stuck" when she sat or stood too long.  Frank's knees sounded like

23

"popcorn." She was having more dizziness. She could not afford to see her psychiatrist and cried "all the time." [AR 160.]

Frank had been seeing a number of doctors, psychologists or pain specialists since 2006. She listed the following medications: Ambien, Antivert, Aspirin, Bentyl, Celexa, Effexor, Folic Acid, Nexium, Norethindrone, Pamelor (Nortriptyline), Robaxin (muscle relaxant), Synthroid, Topomax, Vicodin, and Zyrtec. [AR 165-66.] Frank had a number of tests in 2006-07, including blood work, MRIs of the back, a chest x-ray and a vision test. [AR 167.]

In the last page of the report, Frank wrote:

> I have thoughts of putting hot coffee in my plants. I wonder what it would be like to pour a soda in my fish tank. I have been hearing voices, I have been suffering from vertigo, thats why it has been so hard for me to finish this...and I have been sick more often than not.

[AR 169.]

In May, 2007, Frank was given a referral to see an ENT for evaluation and management of severe vertigo. The referral was closed on August 7, 2007, after it was not used. [AR 359.]

On June 5, 2007, Frank filed a request for an ALJ hearing, stating her condition had worsened and she was not improving. [AR 69.]

On July 2, 2007, Frank had an audiological evaluation. [AR 370.] She complained of bilateral "high pitched whining" tinnitus, decreased hearing and dizziness. She stated she had episodic dizziness for seven years, worsening over the past three years. She felt the dizziness as an "objective spinning, worse in supine." She had a past history of recreational noise exposure to loud music and race care engines. The test revealed normal hearing. There was some sensorineural loss at right consistent with cochlear site of lesion and normal middle ear function. [AR 370.]

24

In July 2007, Frank had a consultation with Robert M. Martin, a physician's assistant with Presbyterian. [AR 355, 368.]She was seen at the request of Dr. Bellew regarding complaints of vertigo and otalgia.  She stated she developed vertigo six months ago and experienced vertigo when she lay down to sleep or rose to a sitting position.  She also complained of ear pain that was ongoing for two months and believed she may have lost some hearing.  Her past medical history was: chronic back pain; osteoarthritis; Hashimoto's thyroiditis; migraines; and sciatica.  She was taking Ambien, Effexor, Pamelor, Zyrtec, Nexium, Topamax, Folate, Synthroid, Aspirin, Celexa, Bentyl and Micro-Nov. [AR 355.]

Frank told Martin that she drank alcohol, "approximately 72 ounces a week, which translates to a six-pack of beer.  She has a 20 pack-year of cigarette smoking."  She drank ten cups of coffee daily. [AR 355.] During the examination, Frank was alert and in no acute distress.  She weighed 170 pounds.  She spoke clearly and communicated well.  The examinations of her eyes and ears were generally normal. [AR 356.] The impression was: benign paroxysmal positional vertigo, resolved and temporaomandibular joint ("TMJ") disorder.  He recommended a craniofacial workup to address the TMJ issues.

On August 29, 2007, Dr. Mark Berger performed a neurological examination on Frank.  She had been referred by Dr. Bellew because of numbness and paresthesias of the body.  The record notes that Frank had noticed intermittent tingling and numbness involving various parts of the body, including calves, thighs, feet, arms, forehead, cheeks, and chest, for many years. [AR 345, 360, 364.] She felt weak in her hands and legs and had vertigo.  Frank claimed she had memory problems and concentration difficulties.  She had migraine headaches that had not changed although Topamax helped.  It was difficult for Frank to walk because of lower pack pain.  She also suffered pain throughout her neck and back.  She had no recent head trauma.

25

Dr. Berger noted her past medical history as including Hashimoto's thyroiditis; IBS, GERD, and depression/anxiety. She was taking Topamax, Ambien, Nortriptyline, Bentyl, Aspirin, Levothyroxine, Zyrtec, Effexor, Celexa, Nexium, and female hormone replacement. According to this record, Frank had no history of alcohol abuse and had never used recreational drugs.[26] She smoked a pack of cigarettes a day, but denied any chest pain or difficulty breathing. She denied difficulty with her vision but said she had lost 20 pounds since her teeth were pulled. Frank complained of chronic pain in all of her joints.

Dr. Berger's examination of Frank showed she was alert, oriented, and followed commands well. Her eyes appeared normal and her motor examination was normal throughout. [AR 347.] There was decreased sensation to sharp object throughout both Frank's upper and lower extremities. She could perform finger-to-nose and heel-to-shin examinations. Her gait was normal. The nerve conduction studies appeared normal, as did the EMG study.

Dr. Berger reviewed a March 29, 2007 cervical MRI scan that revealed spondylitic changes, with the greatest at C5-6 which produced some mild narrowing of the foramina at that level. There were no significant lesions. A lumbar scan of March 23, 2006, revealed spondylitic changes at multiple levels, but with no significant lesions. [AR 347.] Neither scan or report is part of the record.

Dr. Berger concluded that the etiology of the complaints of numbness and tingling was unclear. The EMG and nerve conduction studies revealed no evidence for a peripheral neuropathic process. The cervical lumbar MRI scans revealed no significant lesions to explain the symptoms. Frank exhibited difficulties with memory and concentration. An EEG might in order to rule out

---

[26]This statement is inconsistent with other records. *See, e.g.,* AR 255-57.

encephalopathy, degenerative process, or focal abnormalities.  The pain throughout the spine and joints was most likely of musculoskeletal origin. [AR 349.]

On December 11, 2007, Dr. Berger conducted a follow-up examination.  The reports states that somatosensory-evoked responses revealed no evidence for disturbance involving central somatosensory pathways.  The EMG and nerve conduction studies were normal.  An EEG revealed no focal abnormalities or a generalized disturbance.  Frank returned, however, with the same symptoms.

As of this date, Frank was observed to move all extremities well and had a normal gait.  Dr. Berger had no "clear neurological explanation" for the intermittent numbness or tingling paresthesias involving different parts of the body.  Dr. Berger suspected the problems with memory or concentration stemmed from age and stress. [AR 354.]

### *2008 Medical Records*

On January 10, 2008, Frank was seen by NP Bellew.  She weighed 168 pounds.  She complained of moderate pain in her joints, knee and wrist.  She had chronic pain in all of her joints and back.  There were some changes noted in x-rays and the MRI, but there were no significant findings.  Frank had a rheumatology evaluation and was told she did not have rheumatoid arthritis. They suggested a neurology exam, but all was normal there as well. [AR 302.] It was difficult regulating her hypothyroidism.  Frank reported she had not been taking Synthroid apart from other medication or food.  Her migraines were fairly well controlled by Topamax.  She was seeing a psychiatrist for her depression and sleep disorder.  Even with medications, Frank still had problems. Her hyperlipidemia was not severe.  She had abnormal uterine bleeding.  She was still smoking and

trying to quit.  The exam did not reveal anything abnormal.  Frank was prescribed Tramadol[27] for chronic pain and advised her to consider acupuncture.  She was to take different doses of thyroid medication.  Her depression was stable then.  She was referred to a specialist for her dysfunctional uterine bleeding.

On January 10, 2008, there is a referral to an optometrist from Dr. Bellew that states Frank was diagnosed with dry eye and macular degeneration in the past.  She complained of pain and changes in vision to her left eye. [AR 343.] This referral order was administratively closed on February 10, 2008, because it had been 30 days or more without making a related appointment.

An optometric examination record dated March 11, 2008 (date is unclear) states that Franks vision appeared stable notwithstanding her history of Hashimoto's disease. [AR 341.] The record is difficult to read.

On April 1, 2008, Frank was seen by Dr. Kniffen regarding her vision or watery eyes.  There were no findings of optic nerve pathology.  She was to monitor any changes through annual exams. [AR 296.] In another record, that may be from April 1, 2008, there are notes that Frank's left eye was 4mm larger than the right which might be caused by Hashimoto's disease. [AR 339.] Her eyes were always watering and they ached on occasion, for years.  This record indicated that Frank read, did puzzles, and played with her dogs.  She used a computer for 1-2 hours a day.[28] [AR 339.]

On July 2, 2008, Frank complained of irregular menses.  She weighed 165.6 pounds. [AR 327.]

---

[27]Tramadol is used to relieve moderate pain. It is similar to narcotic pain medications.  www.webmd.com

[28]The entry looks like "12" hours a day but the Court presumes it means 1-2 hours a day. [AR 339.]

On August 21, 2008, Frank attended the ALJ hearing. [AR 34.] The ALJ thoroughly explained Frank's right to representation at the hearing, but Frank declined and proceeded with the hearing on her own. [AR 36.]

Frank provided testimony at the hearing, including the fact that she weighed 157 pounds at this time and had lost 30 pounds over the last six months.[29] [AR 40.] Frank was not trying to lose weight, nor had any doctor said whether she should lose weight. [AR 42.]

She testified that she had worked for APS as an office manager and that she walked off the job because they "basically told [her] [she] was an idiot." [AR 44.] Frank started her work at APS in a temporary position which she said was fine.  Then, she applied and obtained a position with APS and she became "the pariah." [AR 44.] A new supervisor was brought in, and Frank was told she did not know what she was doing. [AR 45.]

When asked what the biggest problems were that prevented Frank from working, she stated "it's a balance between mental and physical."  She described not being able to sit in one position for long, having lumbar problems and sciatic nerve difficulties, being "riddled with arthritis," receiving injections and procedures that did not help with the pain, losing her grip in her hands, numbness in her fingers, and stiffness. [AR 45-46.] Frank said that within 15 to 20 minutes of sitting, her back stiffened up and her lower extremities fell asleep. [AR 47.]

Regarding her mental issues, she stated "I can't fathom anybody telling me what to do, when they don't even know what their job is or what mine is.  I have panic attacks."  She was throwing up before she quit her job and was "sick all the time." [AR 46.]

---

[29]This testimony about weight changes does not appear accurate.  In July 2006, there is a medical record indicating Frank weighed 175 pounds and that she weighed 177 pounds in February 2007.  By August 2008, it appears she may have lost 18-20 pounds rather than 30 pounds over some period of time. [AR 95.]

While Frank had been seeing a psychiatrist, she testified that she no longer could afford it because it would cost $25 every week. [AR 46.] Frank and her husband were currently seeing a marriage counselor through the VA. [AR 47.]

Frank lived in a home with her husband, and they had three dogs and three cats. During a 24-hour day, Frank testified she was in bed 16 hours due to pain, swelling, and depression. [AR 48.] Doctors reported that her thyroid levels and blood work were normal. There are no corresponding medical records indicating Frank reported to any physician that she was staying in bed 16 hours of the day. Frank was in pain all of the time and had taken Vicodin and Ultram.[30] However, she did not want to "be a pill-popping junkie." She was referred to a sleep clinic. [AR 49.]

Frank told the physician that she had a bone spur on her right foot that was growing, her feet were bothering her, her knees sounded like "popcorn," she had difficulties getting off the toilet, had a hard time moving, could not stand up straight, had a hard time holding her coffee mug, and was getting tremors. [AR 50.] She further told the doctor that everything was wrong with her from her head to her toes. The doctor said he had no answers but would refer her to a sleep clinic. [AR 50.]

At that point, the ALJ asked the vocational expert (VE) some questions. [AR 50.] The VE first asked for clarification about Frank's work history. Frank stated she did secretarial and administrative clerical work in temporary positions for a vocational services group. She performed various jobs for that agency or group. Frank worked for APS only from 2005 into 2006, or received her last check in early 2006. [AR 52-53.] Frank stated she was a temp with APS for about a year before she actually applied for and obtained the APS job. [AR 53.]

---

[30]There are very few medical records indicating Frank was prescribed Vicodin or that she used it for more than 6-7 months.

After this clarification, the VE stated Frank was a secretary and that someone performing the job she described would be in a skilled position, SVP six, and sedentary. She also did data entry work, which was a semi-skilled job, SVP four, sedentary. [AR 54.]

The ALJ posed a hypothetical that Frank could occasionally lift 20 pounds, frequently lift 10 pounds, and could sit, stand or walk for six hours in an eight-hour day with normal breaks. Posturally, the individual could only occasionally climb, use ladders, ropes or scaffolds, balance, stoop, kneel, crouch, and crawl. The individual would avoid concentrated exposure to extreme cold as well as to hazards and unprotected heights. [AR 55.] The VE testified that under this hypothetical, the individual could perform her past relevant work – the secretarial or data entry jobs. [AR 55.

In the next hypothetical, the VE was to assume the individual could sit for approximately 15-20 minutes at a time before needing to stand, stretch or walk around. The VE testified that the individual could not perform the past relevant work under that hypothetical.

The ALJ asked if the claimant could perform past relevant work, if she had bad days when she could not get out of bed and had to miss work four times a month on an unscheduled basis. The VE testified that she would not be able to perform the jobs with such excessive absences. [AR 56.] The ALJ also asked if an individual were to miss four or more days a month on a regular basis, if there were any jobs in the competitive marketplace, she could perform. The VE testified that there would not be jobs.

## V.    DISCUSSION

### A.    Alleged Legal Error

Frank argues that the ALJ committed error in: (1) affording minimal weight to the opinions of the Administration's Examining Medical Sources, (2) finding that Frank did not suffer from a severe mental impairment under the "de minimis" requirements of step-two; (3) failing to apply the

required pain and credibility assessment; and (4) determining that Frank could perform past relevant work.  In addition, Frank contended that some of the ALJ's findings were not supported by substantial evidence.

      B.    <u>Analysis</u>

          1.    <u>Weight Assigned to Opinions of Agency Physicians' Opinions</u>

Social Security Ruling ("SSR") 96-6p provides in part that state agency medical and psychological consultants' findings of facts must be treated as expert opinion evidence.  Although ALJs are not bound by findings of state experts, they may not ignore such opinions and must explain the weight given to these opinions in their decisions.  Opinions of agency or program consultative physicians and psychologists may be given weight but only insofar as they are supported by evidence in the case record.  SSR 96-6p, 1996 WL 374180, *1-3 (July 2, 1996).

An ALJ is not free to pick and choose portions of expert opinions that support an ALJ's decision.  *See* <u>Andersen v. Astrue</u>, 319 F. App'x 712, 718, 2009 WL 886237 (10th Cir. Apr. 3, 2009) (unpublished) (discussing treating physicians' opinions).  *See also* <u>Robinson v. Barnhart</u>, 366 F.3d 1078, 1083 (10th Cir. 2004) *(per curiam)*; <u>Hamlin</u>, 365 F.3d at 1219.  However, an ALJ is entitled to resolve any conflicts in the record, provided that the ALJ explains the evidence that conflicts with an expert's opinion.  <u>Haga v. Astrue</u>, 482 F.3d 1205, 1208 (10th Cir. 2007) (internal citations omitted).  Where an ALJ considered all the evidence, discussing supporting evidence as well the uncontroverted evidence he chose not to rely on or the significant probative evidence he rejected, the Court does not re-weigh the evidence or second-guess the ALJ's decision.  See <u>Clifton</u>, 79 F.3d at 1009-10; <u>Rutledge v. Apfel</u>, 230 F.3d 1172, 1174 (10th Cir. 2000).  *See also* <u>White v. Barnhart</u>, 287 F.3d 903, 909 (10th Cir. 2001) (court will not second-guess the ALJ decision).

Frank argues that the ALJ erred under SSR 96-6p in affording minimal weight to the opinions of Dr. Greg McCarthy, M.D., and psychologist Louis Wynne, Ph.D. [AR 242-245, 255-258.] Frank further contends that these consultative physician's and psychologist's reports and assessments conflict with the assessed RFC with respect to functional and mental limitations. [Doc. 16, p. 6.]

On February 3, 2007, Dr. McCarthy, performed a consultative examination of Frank. [AR 242-245.] Dr. McCarthy discussed Frank's medical history and an April 2006 MRI report indicating a annular disk tear, no foraminal narrowing, severe degenerative loss of disk height and signal at L5-S1 and mild diffuse disc bulging. [AR 242.]

Dr. McCarthy's examination of Frank was essentially normal.  She transferred to the exam table and got up from the chair with "slight difficulty."  The range of motion in her shoulders, cervical spine, and lumbar region was normal, as was the range of motion in both hips, ankles, and knees.  The straight leg raise was negative sitting and supine.  Frank could lie straight back on the table and resume a sitting position with "slight difficulty."  She was able to walk on her heels and tiptoes and do heel-to-toe walking.  She could squat.  Her neurologic motor strength was 5/5 in all proximal muscle groups. [AR 244.]

Yet, Dr. McCarthy concluded "based on her history of cervical and lumbar disk disease and chronic pain" that she would have difficulties negotiating long and short distances on uneven terrain and have difficulties sitting, standing, and walking for extensive periods of time over 20 minutes without break.  However, Dr. McCarthy also found that Frank would have only mild restrictions with bending, stooping, or crouching.  She could carry 10 pounds occasionally and was unlimited in handling, reaching, and grasping unless she was standing, stooping or squatting. [AR 245.]

The ALJ noted Frank's degenerative changes in her spine and mild nerve root impingement at L5. He also commented that she had some pain with range of motion and severe tenderness to palpitation, referring to other medical reports. He concluded that she could perform light work, was able to lift up to 20 pounds occasionally, 10 pounds frequently, sit, stand or walk for a total of about 6 hours with normal breaks. Frank had occasional limits on climbing ramps, stairs, ladders, ropes, etc. and occasional limits on balancing stooping, kneeling, crouching, and crawling. [AR 26.]

These RFC findings were supported by two separate non-examining agency physicians' reports – one performed in September 2006 by Dr. Green and one in February 2007 by Dr. Kando. Dr. Green provided the same limitations as those used in the ALJ's hypothetical to the VE. [AR 197.] Dr. Kando provided the same or similar exertional limitations as those found by Dr. Green. [AR 248.] Dr. Kando, however, had the benefit of reviewing Dr. McCarthy's notes of his recent examination of Frank. She concluded that while Dr. McCarthy found Frank would have difficulties walking, sitting or standing for more than 20 minutes without breaks, Dr. McCarthy's examination reasonably supported Frank's ability to sit for two hours at a time and stand or walk up to 6 hours with regular breaks. [AR 253.]

The neurologist, Dr. Berger, conducted an examination of Frank in August 2007 and December 2007. The physical exams again were essentially normal. There was decreased sensation to sharp objects throughout Frank's upper and lower extremities, but she could perform finger-to-nose and heel-to-shin tests. Her gait was normal; she moved her extremities well. The nerve conduction and EMG studies were normal. There was no clear neurological explanation for Frank's complaint of numbness or tingling in different parts of the body. [AR 347, 354.]

In 2008, Frank was seen by NP Bellew who noted that all testing essentially was normal, including rheumatology and neurology examinations. [AR 302.] The exam that day, on January 10, 2008, did not reveal anything abnormal.

In reaching the RFC findings, the ALJ carefully examined all of the opinion evidence and the agency physicians' RFC assessments. [AR 28.] The ALJ noted that the agency physicians considered Frank's "largely normal physical examination results" and that their assessments were consistent with Frank's daily activities as evidenced in the record as a whole. Thus, the ALJ explained that he gave assigned "significant weight" to these opinions.

The ALJ also thoroughly discussed Dr. McCarthy's examination and findings, concluding that Dr. McCarthy's "opinion was undermined by the results of his own objective examination, on which the only abnormalities were slight difficulty getting on and off the exam table, and slight difficulty lying down on the table and resuming sitting." [AR 28.] For this reason, the ALJ stated he gave Dr. McCarthy's opinion as to limitations "little weight."

In addition, the ALJ considered Frank's daily activities and the fact that she was primary caregiver for her husband, who is 100% disabled, and had been so since the late 1980s. Frank took care of three dogs, three cats and three fish. Although Frank said her hands became numb while using a computer, the ALJ observed her using a computer at the hearing.[31] [AR 27.]

The Court concludes that the ALJ did not err in discounting Dr. McCarthy's opinion. He provided careful explanations as to the evidence on which he relied and why he did not give more weight to McCarthy's opinion. In addition, the Court finds that there was substantial evidence supporting the ALJ's RFC finding, as fully described in the ALJ's written decision. Even if the

---

[31]Plaintiff argues Frank's use of a computer at the hearing was very brief.

Court disagreed with the end result, it would not re-weigh the evidence, as that is not the Court's role.  The Court rejects Frank's argument that the ALJ "played doctor" in assigning the weight he did to the agency physicians' findings.

2.      Step Two Finding[32]

"A determination that an impairment is "severe" at step two requires only *a de minimus* showing.  Grogan v. Barnhart, 399 F.3d 1257, 1263 (10th Cir. 2005).  At step two, Frank bears the burden of making "a threshold showing that [her] medically determinable impairment or combination of impairments significantly limit [her ability to do basic work activities]."  Williams 844 F.2d at 75.

In Barrett v. Astrue, 340 F. App'x 481, 484, 2009 WL 2400267 (10th Cir. Aug. 6, 2009) (unpublished), the claimant also argued that the ALJ's finding of no severe mental impairment at step two was error or not supported by substantial evidence.  In that case, similar to the findings here, the ALJ determined at step two that the claimant suffered from several severe physical impairments but no severe mental impairments.

The Tenth Circuit Court of Appeals concluded that the applicant in Barrett did not identify any error at step two. In that case, the ALJ "made an explicit finding that [claimant] suffered from [a] severe impairment[ ]. That was all the ALJ was required to do in that regard." Id. (*citing* Oldham v. Astrue, 509 F.3d 1254, 1256 (10th Cir. 2007)).  The Tenth Circuit further explained:

> Under the regulations, once an ALJ finds that a claimant has at least one severe impairment, he does not err in failing to designate other disorders as severe at step two, because at later steps the agency "will consider the combined effect of all of [claimant's] impairments without regard to whether any such impairment, if considered

---

[32]Under this section, the Court analyzes both Frank's argument regarding the alleged error at step two and her argument that the ALJ erred in discounting the consultative agency psychiatrist's opinion.

separately, would be of sufficient severity." 20 C.F.R. § 404.1523;
see also id. § 416.945(e) ("[W]e will consider the limiting effects of
all your impairment(s), even those that are not severe, in determining
your residual functional capacity.") "After finding [a] severe
impairment[ ], the ALJ still had the task of determining the extent to
which [claimant's] impairments ... restricted [his] ability to work."
Oldham, 509 F.3d at 1257.

Barrett, 340 F. App'x at 484.[33] *See* Grotendorst v. Astrue, No. 09-2132, 2010 WL 1049791, at *4

(10th Cir. Mar. 22, 2010) (unpublished) (explaining that an error at step two concerning one

impairment is usually harmless when the ALJ finds another impairment is severe and proceeds to

the remaining steps of the sequential evaluation) (*citing* Carpenter v. Astrue, 537 F.3d 1264, 1266

(10th Cir. 2008)).

Thus, in accordance with Tenth Circuit authority, the ALJ did not commit error at step two

by finding Frank's depression was nonsevere.  The ALJ found Frank had severe impairments of

lumbar DDD, Hashimoto's thyroiditis and GERD at step two and proceeded to the remaining steps.

That was all that is required under the reasoning in Barrett.  Here, the ALJ noted that he considered

"the entire record" in reaching the RFC determination. [AR 26.] He also stated that in making the

RFC determination, he "must consider all of the claimant's impairments, including impairments that

are not severe."  [AR 22.]

Moreover, the decision in Barrett provides further guidance as to other arguments presented

by Frank.  In Barrett, similar to the case at hand, the claimant argued that the ALJ improperly relied

solely upon an assessment completed by an in-house, non-examining physician in support of the

ALJ's finding regarding the severity of the claimant's mental impairment.  Barrett, 340 F. App'x

at 484.

---

[33]The Court recognizes that Barrett is an unpublished opinion and non-binding authority.  However, based
on some of the similarities, the case is instructive.

Here, Frank provides a number of arguments as to why the ALJ erred with respect to findings regarding the mental impairments. First, she claims that the ALJ erred in not providing more weight to psychologist Louis Wynne's consultative examination and report, and that his findings conflicted with the ALJ's RFC determination. Frank argued, in part, that the ALJ should not have given more weight to a non-examining agency psychologist's findings than to those of the consultative psychologist.

In Barrett, the Court found no error by the ALJ in relying on a PRT assessment completed by an agency non-examining physician. That was particularly true because of other evidence in the record that supported the ALJ's step four findings. Barrett, 340 F. App'x at 484-85. Such is the case here.

The ALJ noted Frank's diagnoses of major depressive disorder, PTSD, panic disorder, and anxiety-related symptoms. [AR 24.] However, consistent with the ALJ's written decision, treatment notes indicated that Frank's depression was well controlled by medication. For example, a December 2005 medical record notes that Frank's depression was well controlled with medication. [AR 229.] In January 2006, Frank denied significant depression. [AR 227.] In February 2006, Frank denied depression. [AR 224.] In May 2006, Frank's depression was described as moderate to severe, but she was given additional medications. [AR 180.] Although she stated she walked off her job in December 2005 in part because of depression, she did not seek psychological treatment of any kind until May 2006. [AR 177.] In January 2007, she was "doing well" with her depression. [AR 319.] Her depression/anxiety was "stable." [AR 319.] In February 2007, Frank's depression was "stable" and "well controlled by medications." [AR 315.] In 2008, her depression was described as "stable. [AR 302.]

The ALJ further found that Frank's described daily activities "bolster the conclusion that the claimant's mental symptoms are adequately controlled by medication." [AR 25.] These activities, including being the primary caretaker of her spouse who was 100% disabled for years, belied her low GAF scores. [AR 25.] With respect to other daily activities, the ALJ observed that Frank had only mild limitations in her ability to feed and dress herself. [AR 25.] She could drive a car and drove both herself and her husband to appointments, as well as to the grocery store. She and her husband cared for six pets. She played with their dogs, read, and watched television. She ensured her husband's safety and reminded him to take his medications. [AR 25.] One of the most recent 2008 medical records indicates Frank used the computer 1-2 hours a day. [AR 339.]

In addition, the ALJ noted "highly inconsistent information" from Frank regarding her daily activities which was discussed above. The ALJ also observed that Dr. Gabaldon, the agency psychologist, found Frank's depression to be a nonsevere impairment. [AR 25, 28.] Dr. Gabaldon's evaluation, along with Frank's daily activities, supported the ALJ's finding that Frank had mild limitations in her social functioning. [AR 25, 212.] However, because the agency psychologist apparently did not consider Frank's PTSD symptoms and diagnosis, the ALJ gave the agency psychologist's opinion "some, but not great weight." [AR 28.]

The agency's consulting psychologist, Dr. Wynne, found that Frank could read and understand basic written instructions and that her concentration and ability to persist at simple work tasks was mildly impaired. [AR 28, 256.] Dr. Wynne observed Frank's intelligence to be average. However, the primary distinction between Dr. Wynne's report and Dr. Gabaldon's findings was that Dr. Wynne concluded Frank could interact well with the general public, but that she would have difficulty interacting with her coworkers and her supervisors. [AR 257.] Notwithstanding this finding, Dr. Wynne stated that Frank could adapt to changes in the workplace, recognize hazards,

and manage her own benefit payments [AR 257] (despite Frank's subjective reporting that she could not handle finances).

In his decision, the ALJ explained that Dr. Wynne's opinion regarding Frank's cognitive abilities was consistent with the record as a whole, but was overly conservative regarding her ability to interact with supervisors and coworkers. Thus, the ALJ stated he gave Dr. Wynne's opinion, "some, but not great weight." [AR 28.] The ALJ further noted that in the area of social limitation, Frank had mild limitation. While Frank walked off her job in December 2005 due to increased irritability (and various subjective explanations), "her daily activities indicate she retains a considerable degree of social functioning. She and her husband go to the doctor, the grocery store, and Wal-Mart together." [AR 25.]

The Court again finds the ALJ did not commit error in discounting some of Dr. Wynne's opinions, and that he adequately explained why he did not give Dr. Wynne's opinions more weight. Dr. Wynne's report did not specify why he found Frank would have difficulties interacting with coworkers and supervisors. Dr. Wynne's evaluation indicates Frank drove herself to the office, was appropriately dressed and groomed, maintained good eye contact, "related easily," and was cooperative. She was "alert and well-oriented."

In determining Frank's level of mental impairment, the ALJ did not rely entirely on the state agency's non-examining reports or the examining physicians' reports. The ALJ relied on both reports in part and also on Frank's daily activities. The Court rejects Frank's position that the ALJ "played doctor," that the consultative physicians' opinions were entitled to greater weight, or that

40

the ALJ had a duty, under the circumstances, to recontact Dr. Wynne.[34]  In sum, the Court finds no

error at step two and also finds that substantial weight supports the ALJ's findings related to mental

impairments, both at step two and step four.

3.      Credibility and Pain Assessment

"Credibility determinations are peculiarly the province of the finder of fact, and we will not

upset such determinations when supported by substantial evidence."  Kepler v. Chater, 68 F.3d 387,

391 (10th Cir. 1995) (quotation omitted).  Here, the ALJ carefully considered all of the evidence,

and determined that while Frank's medically determinable impairments could reasonably be

expected to cause some of the alleged symptoms, her statements about intensity, persistence and

limiting effects were not credible. [AR 27.]

Frank argues that the ALJ's credibility assessment relies "on very little if any medical

evidence, let alone substantial evidence."  Doc. 16, p. 13.  The Court disagrees.  Indeed, the record

clearly demonstrates problems with Frank's credibility, even if the ALJ did not discuss each one of

those instances.  See Clifton, 79 F.3d at 1009-10 ("The record must demonstrate that the ALJ

considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.");

Frantz v. Astrue, 509 F.3d 1299, 1303 (10th Cir. 2007) (the ALJ is not required to "discuss every

piece of evidence.")

The ALJ noted that according to Frank, her hands go numb when she holds the phone, writes,

washes or hair, or types on a computer.  Frank contended she stayed in bed 16 hours a day.  None

---

[34]Under the governing regulations, an ALJ must recontact a care provider when the information the doctor provides is "inadequate ... to determine whether you [the claimant] are disabled." 20 C.F.R. § 416.912(e).  There is evidence here that the evidence was inadequate, such that the ALJ was required to recontact Dr. Wynne.  See White v. Barnhart, 287 F.3d 903, 908-09 (10th Cir. 2001) (doctor's information not so incomplete that it could not be considered).

of this subjective testimony squared with the fact that Frank was the primary caretaker for her husband who was 100% disabled, that she and her husband took care of six pets, that she read, watched television, did puzzles, performed household chores, drove her and her husband to appointments, and used a computer.

In addition, the ALJ found that Frank's complaints of disabling symptoms exceeded the results of objective physical examinations, which were generally normal.  For example, Frank stated she had difficulty walking, but doctors consistently observed her with a "normal gait," and able to get on and off an examining table with only mild difficulties.  She complained of numbness in her hands, but all neurological testing was normal.

Although the ALJ did not specifically mention the following instances that further undermine Frank's credibility, it is notable that Frank checked every box on a disability services form, indicating she was impaired in every area, from talking, hearing, and understanding to sitting. [AR 132.]  Yet, her own subjective reports as well as objective medical testing belie this level of impairment.  Her reported fluctuations in weight, loss of teeth and hair, and allegedly significant use of narcotic pain medication are either not explained or not confirmed by the objective medical evidence.

The Court determines that the ALJ's credibility findings are "closely and affirmatively linked to substantial evidence," Kepler, 68 F.3d at 391, and therefore, will not disturb them.

With respect to the ALJ's assessment of Frank's pain, "a claimant's subjective allegation of pain is not sufficient in itself to establish disability." Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993).  *See also* Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1989) (disability requires more than the mere inability to work without pain).

The ALJ carefully analyzed Frank's allegations of pain.  In his written decision, the ALJ noted that once an underlying physical or mental impairment could reasonably be expected to produce pain, the ALJ must evaluate the intensity, persistence and limiting effects of the claimant's symptoms to determine to which they limit the claimant's ability to perform basic work activities. [AR 27.] The ALJ further explained that if statements concerning intensity, persistence, or functional limiting effects of pain are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire record.

The ALJ examined the records regarding Frank's allegations of pain and found the reported symptoms were not substantiated by objective medical evidence.  Further, he determined that her symptoms were not credible to the extent they were inconsistent with the RFC. [AR 27.]

Under the facts of this case, the ALJ's analysis of Frank's pain allegations was sufficient. While the ALJ discussed some of the record evidence in this regard and some of the reasons Frank was not credible, the record provides substantial evidence to support his pain and credibility findings.  To summarize, in February 2004, Frank complained of occasional pain and took only Ibuprofen. [AR 269.] In December 2005, when she quit her job, she did not allege she had to stop working because of pain.[35]  In December 2005, Frank complained of aches and pain all over and had been taking Flexeril (muscle relaxant) since July 2005, although there is no corresponding medical record.  She rated her pain as a 4 of 10. [AR 228.]

In January 2006, she did not take pain medications and denied the need for them. [AR 227.] In February 2006, she took Flexeril, but the pain level on the medical records is marked as "none."

---

[35]Frank did so allege in one record, but many other records contradicted that allegation.

[AR 223.] In April 2006, Dr. Pace noted mild to moderate pain on examination with an excellent range of motion and muscle strength of 5/5 in all joints. [AR 189.] He also noted that there was severe tenderness with palpitation in some areas.  He recommended conservative treatment rather than surgery.  Her pain was assessed as 4-5. [AR 191.]

In May and June 2006, Frank continued with conservative treatment for pain from Dr. Pace and noted improvements in pain in August 2006. [AR 183, 185, 282.] In January 2007, there is a notation that Frank was prescribed Vicodin, apparently for the first time. [AR 319.] By May 2007, Frank had stopped taking Vicodin. [159.] In July and August 2007 medical records, no pain medication is listed.  [AR 345, 355.] In January 2008, Frank was prescribed a non-narcotic pain medication.

The Tenth Circuit instructs that "[o]ur precedents allow the ALJ to engage in less extensive analysis where 'none of the record evidence conflicts with [his] conclusion that [a] claimant can perform light work.'"  Wall v. Astrue, 561 F.3d 1048, 1068 (10th Cir. 2009) (internal citation omitted).  The ALJ discussed the relevant medical evidence in some detail.  Moreover, he considered Luna credibility factors in assessing Frank's complaints, including medications prescribed, objective test results, physicians contacted, description of her daily activities, and credibility.  The Court concludes that the ALJ's pain and credibility analysis were sufficient under the circumstances of this case and that no error was committed.  Moreover, substantial evidence supports the ALJ's findings as to credibility and pain.

4.    RFC Determination

At step four, the ALJ is required to evaluate the claimant's physical and mental RFC, the physical and mental demands of the claimant's past relevant work, and decide if the claimant has the ability to perform those job demands.  Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996).

Frank argues the ALJ's RFC finding is not supported by substantial evidence and that the ALJ failed to apply the required Winfrey analysis. [Doc. 16, p. 19.]

The Court concludes that, for the reasons described more fully above, the ALJ provided an adequate discussion of Frank's physical and mental RFC.  In determining the RFC, the ALJ devoted several pages of the opinion describing Frank's complaints, medical treatment, testing results, daily activities, credibility, and opinions of consulting and non-examining physicians. [AR 27-28.] In addition, the ALJ properly supported his opinion that Frank did not have a severe mental impairment.  These findings are supported by substantial evidence.

With respect to Frank's arguments that the ALJ did not make specific findings of the mental and physical demands of Frank's prior relevant work, the Court disagrees.  The ALJ specifically stated that the VE testified the RFC assessment would not preclude the past work as a secretary/administrative secretary and data entry worker. [AR 29.] Based on that testimony and after comparing Frank's RFC with the physical and mental demands of the past relevant work, the ALJ concluded Frank could perform the jobs as they were generally performed.  There is no error.  *See* Jordan v. Barnhart, 213 F. App'x 643, 646, 2006 WL 3692458 (10th Cir. Dec. 15, 2006) (unpublished) (court's review of the record indicates that the RFC determination was consistent with the medical evidence and that, therefore, the substantial evidence test was satisfied; ALJ's reliance on VE's testimony as to remaining phases of the step four analysis was proper).  *See also* Gibson v. Barnhart, 69 F. App'x 983, 986, 2003 WL 21702496 (10th Cir. Jul. 23, 2003) (unpublished) (ALJ incorporated VE's testimony into his findings and did not improperly delegate the analysis to the VE).

Finally, the Court determines that substantial evidence supports the ALJ's finding that Frank's limitations did not preclude her from performing the past relevant work as that work was

generally performed.  Moreover, Frank did not provide any evidence to show she was unable to perform her past relevant work.

**VI.**     **RECOMMENDED DISPOSITION**

That Plaintiff Frank's motion to reverse or remand be denied and that this entire matter be dismissed, with prejudice.

*Lorenzo F. Garcia*
_____
Lorenzo F. Garcia
United States Magistrate Judge